Case 1:14-mj-02247-SAG   Document 2   Filed 10/07/14   Page 1 of 14

14-2247SAG
14-2248SAG
14-2249SAG
14-2250SAG

IN THE UNITED STATES COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Paul Neikirk, Special Agent with the Drug Enforcement Administration, do state as follows:

1. Your affiant is currently employed by the United States Drug Enforcement Administration (DEA) as a Special Agent, and has been since September 2002. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 21, U.S.C. § 846 and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21, United States Code Section 846. As part of my employment with DEA, I attended the seventeen week basic agent training academy in Quantico, VA. During this training I was provided instruction in criminal investigation, constitutional law, drug identification, rules of evidence along with interview and interrogation. Additionally, I have attended numerous hours of investigative training as it relates to drug law enforcement.

2. Your affiant is currently assigned to the Washington Field Division, Baltimore District Office. In the course of my current employment, I have participated in numerous federal and state narcotics investigations relating to drug trafficking, drug smuggling, and money laundering violations. During the course of those investigations, I have been involved in the use of the following investigative techniques: interviewing informants and

1



FILED _____ RECEIVED
LODGED _____

OCT 07 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, consensual monitoring and recording of telephonic communications; telephone pen register and caller identification system data; court-authorized electronic surveillance, including wire interceptions; and preparing and executing search warrants that have led to seizures of narcotics and other contraband. The information in this affidavit is based on my personal knowledge and information provided to me by other law enforcement officers.

3. This affidavit is submitted in support of a criminal complaint charging **Mardell ABRAMS (Abrams), Eric Maurice CLANTON (Clanton) Travius Edwin Jamont GREGORY (Gregory) and Donald Lee COX, Jr., (Cox)** with conspiracy to distribute and possess with the intent to distribute 500 grams of more of cocaine and a quantity of heroin, in violation of 21 U.S.C. § 846.

4. From its beginning, this investigation has centered on information given to the Harford County Task Force that Mardell **ABRAMS** is one of the largest cocaine distributors in the Harford County area. Your affiant has utilized confidential informants in an attempt to infiltrate the organization and gain intelligence. These confidential informants have all provided information about **ABRAMS**, specifically stating that **ABRAMS** is obtaining large amounts of cocaine and heroin (collectively CDS) from unknown sources of supply in Philadelphia, Pennsylvania, and is then transporting the CDS back to Harford County, Maryland for distribution. These confidential informants

2

have further advised that **ABRAMS** is conspiring with **CLANTON** in the facilitation and distribution of powder and crack cocaine and heroin, throughout counties in Maryland. What is noteworthy about the information received is that none of the confidential informants know each other, but have all provided similar information regarding **ABRAMS** and **CLANTON** and the drug distribution organization operated by them. By use of these confidential informants, numerous controlled purchases of cocaine have been made from **ABRAMS**, in amounts of gram to ounce quantities. These controlled purchases have been made from the automotive shops and stash houses utilized by **ABRAMS** and **CLANTON** to store and distribute their CDS, from residences associated to **ABRAMS**, as well as public use locations/parking lots/etc.

5.   During the course of the investigation, significant evidence has been obtained through controlled buys of cocaine and other investigative techniques, corroborating the fact that **ABRAMS** is involved in a large-scale cocaine and heroin distribution operation, operating throughout Harford, Baltimore and Cecil Counties in Maryland. Your affiant also learned that **CLANTON** plays a major role in **ABRAMS'** drug organization, acting as a contact to the sources of supply and a courier for the organization. It was learned that **ABRAMS** was limiting his conversations concerning the activities, decisions and overall strategy of the organization to **CLANTON**, who would then handle and direct the co-conspirators responsible for distributing drugs to the buyers.

6. Further investigation into **CLANTON** revealed that **GREGORY** was a subject who played a significant role in the organization. It was learned that **GREGORY** assumed the role of distributing CDS on behalf of the organization, to the street level dealers and customers. It was learned that **CLANTON** was directing **GREGORY** on the daily operations of the business, supplying **GREGORY** with quantities of CDS sufficient for the daily distribution. This CDS was then distributed to dealers and customers, who had once purchased directly from **CLANTON**.

7. Mardell **ABRAMS** can be described as a black male, 6', weighing 185 lbs, with a date of birth of December 29, 1981, residing at 24 Pritchard Avenue, Apt. B2, Aberdeen, Harford County, Maryland, 21001. Eric Maurice **CLANTON** can be described as a black male, 5'11", 190 lbs., date of birth of December 16, 1979, residing at 301 Delmar Court, Abingdon, Harford County, Maryland, 21009. Travius Edwin Jamont **GREGORY** can be described as a black male, 5'9", 180 lbs., date of birth of November 11, 1985, residing at 1002 Crimson Tree Court, Apt. B, Edgewood, MD 21040. Donald Lee **COX**, Jr., can be described as a white male, 5'7", 230 lbs., date of birth March 5, 1973, residing at 112 Deaver St. Aberdeen, MD 21001.

8. Based on the investigation, case investigators requested the State's Attorney for Harford County to petition the court for a court order allowing the interception of electronic telephonic communications. On August 20, 2014, your affiant initiated a court ordered interception of electronic telephonic communications of the cellular telephones 410-937-6945, 443-409-2673, 443-422-8281, 443-825-2095, and 667-231-0760, utilized

by **ABRAMS**. Since the initial authorization, additional lines utilized by **ABRAMS** were identified and a court order was issued for the inception of electronic telephonic communications on, 443-876-3882, 443-206-4276, 443-206-0182, 667-231-0760 (this line was deactivated then reactivated), and 410-652-1745. The court orders for interception of electronic telephonic communications were signed by the Honorable M. Elizabeth Bowen, Judge of the Circuit Court for Harford County, Maryland.

9. On August 27, 2014, your affiant initiated a court ordered interception of electronic telephonic communications of the cellular telephones, 443-252-0443 and 443-866-5021, utilized by **CLANTON**. Since the initial authorization, additional lines utilized by **CLANTON** were identified and a court order was issued for the inception of electronic telephonic communications on, 443-206-8034 and 717-688-8546. These orders were signed by the Honorable M. Elizabeth Bowen, Judge of the Circuit Court for Harford County, Maryland.

10. On September 18, 2014, Investigators received authorization for an extension to continue telephonic interception on the telephone lines utilized by **ABRAMS**, 410-652-1745, 443-206-4276, 443-876-3882, 443-409-2673, 667-231-0760, and **CLANTON**, 443-206-8034, 717-688-8546, and 443-866-5021. Since the extension authorization, an additional line utilized by **ABRAMS**, 267-498-9684, was identified and a court order was issued for the inception of electronic telephonic communications on September 21, 2014. These orders were signed by the Honorable M. Elizabeth Bowen, Judge of the Circuit Court for Harford County, Maryland.

11. On September 22, 2014, authorization was granted to intercept telephonic communications over telephone lines, 443-252-0443 and 443-206-5728 utilized by/for **GREGORY**. Since the initial authorization, additional lines utilized by **GREGORY** were identified and a court order was issued for the inception of electronic telephonic communications on 443-567-0458 and 240-385-7479. These orders were signed by the Honorable M. Elizabeth Bowen, Judge of the Circuit Court for Harford County, Maryland.

12. Pursuant to the above mentioned electronic monitoring of the listed cellular telephones being utilized by **ABRAMS**, **CLANTON** and **GREGORY**, numerous telephone conversations were intercepted and recorded as they occurred, which enabled case investigators to identify other co-conspirators in this illegal drug conspiracy. A courier and "cook" for the organization was identified as Donald **COX**, who has been involved with the cocaine and heroin resupply trips to Philadelphia. Throughout the telephonic investigation, case investigators were able to confirm that **ABRAMS**, **CLANTON** and **GREGORY** were obtaining large quantities of cocaine and heroin and re-distributing amounts to others. It was learned over careful review of the coded conversations that persons were exchanging CDS and currency with **ABRAMS**, **CLANTON** and **GREGORY**, as part of this criminal conspiracy. **ABRAMS, CLANTON** and **GREGORY** are known to supply Harford County, Cecil County, Baltimore County, in Maryland.

13. Listed below are a portion of the summarized phone conversations, surveillance observations and interpretations from case investigators regarding

6

**ABRAMS', CLANTON'S, COX'S** and **GREGORY'S** drug organization.

<u>Evidence developed pertaining to ABRAMS, CLANTON, COX and GREGORY Conspiring to Possess With Intent to Distribute Cocaine and Heroin:</u>

On August 26, 2014, case investigators intercepted a series of text messages between **ABRAMS** and **CLANTON**. Pursuant to text messages, **CLANTON** and **ABRAMS** discuss arranging for a re-supply of cocaine and heroin from Philadelphia. The two parties discuss utilizing a courier for the organization to make the trip with **CLANTON**. This subject was later identified as **COX**. **ABRAMS** and **CLANTON** agreed to meet at a location identified as a "stash house" for the organization. Throughout these text messages, **ABRAMS** and **CLANTON** discuss which Philadelphia cocaine source of supply to use, making reference to "Pop," "Ed," and "Lawyer," all street names for these Philadelphia sources of supply. From this investigation, "Pop," has been identified as a main source of supply for cocaine and possibly heroin. At one point during the text exchanges, **CLANTON** advises **ABRAMS** that "Pop" is dry, or out of CDS. It was apparent that **ABRAMS** was directing **CLANTON** to make contact with additional sources of supply. In one text **CLANTON** told **ABRAMS**, "If u want I will go to key girl and its lower." Case Investigators believe that **CLANTON** was referring to utilizing an alternate source of supply for cocaine, because "key girl" has lower/cheaper pricing, and "Pop," the original or main Philadelphia source of supply, did not have cocaine to sell at the time. **ABRAMS** instructed **CLANTON** to, "go ahead," and to, "just go see lawyer." At one point, **ABRAMS** in a text asked **CLANTON** if he took his bag, to which

**CLANTON** replied that he forgot it at a female's residence. **ABRAMS** did not appear happy. (It is believed that **CLANTON** has a bag which may contain a false bottom that he uses to transport cocaine/CDS). Throughout the texts, **ABRAMS** repeatedly told **CLANTON** to go see "Pop." **CLANTON** texted **ABRAMS** that "Pop" will not be ready until the following day.

Later on August 26, 2014, **CLANTON** contacted **ABRAMS** and texted, "now he saing it don't look right wtf smh" "shit dum." Your affiant believes what **CLANTON** was stating here is that the cocaine they are attempting to purchase did not look right and/or was not "testing" properly, meaning the cocaine could be of bad quality. **ABRAMS** replied to **CLANTON**, "can find anything ask pop to." **CLANTON** then texted, "Did pop said dry b said he drop a 14 and it was good but it looked crazy they stand by it but he bout to come rap to me." Case investigators believe that **CLANTON** was telling **ABRAMS** that "Pop" did not have cocaine and that a subject referred to as "B" was testing the cocaine and it wasn't testing to be of good quality or quality good enough to cook the powder cocaine into crack cocaine. **CLANTON** further told **ABRAMS** in a text that this subject is about to come talk to him about the situation. **ABRAMS** again asked **CLANTON** if he called "Pop" that, "need something we dead." Your affiant believes **ABRAMS** was reiterating to **CLANTON** that they have no cocaine and need to find some quick. **CLANTON** then told **ABRAMS** that "Pop" told him tomorrow and that he (**CLANTON**) is going to go on the hunt for a cocaine source of supply. **ABRAMS** then told **CLANTON**, "see if bird can get 2 to hold until tom anybody that it." Case

8

Investigators believe that **ABRAMS** was telling **CLANTON** to have "bird," a member of the organization present for this meet and who appears to be responsible for middling the deal or having contact with the current source of supply of the cocaine they are testing, to purchase two kilograms of the product (cocaine) to hold them over until "Pop" can supply them with the remaining quantity the following day.

**CLANTON** responded by text telling **ABRAMS**, "Got 8 of them they said they got recomposed that's why the aint take it." It's believed that **CLANTON** was advising **ABRAMS** that he purchased a quantity of packaged cocaine, believed to be approximately eight 1/8 kilogram packages, and that the previous intended purchaser did not buy it because they thought the cocaine had been recompressed (recompressing a kilogram of cocaine occurs when the purity of a kilogram of cocaine is lowered by use of a cutting agent and then reformed and packaged again in kilogram weight). **ABRAMS** then confirmed that the kilograms were not "cut" and "recompressed," to which **CLANTON** stated "we good wit 8 I am just waiting on dj," later identified as **COX**, a courier and "cook" for the organization. Your affiant believes what **CLANTON** was stating is that he purchased a quantity of cocaine and was just waiting for the courier (**COX**) to arrive in Philadelphia to assist with transport back to Maryland.

**CLANTON** and **ABRAMS** then texted each other as to where they were, with **CLANTON** advising he is ten minutes out. Case Investigators would note that not long after **CLANTON'S** "ten minutes out" text, surveillance observed **CLANTON** and **COX**, arrive to an apartment occupied/utilized by **ABRAMS** and observed **ABRAMS**,

9

**CLANTON**, **COX** and others frequent the location, removing bags and items from vehicles and returning bags to vehicles, which appeared to contain brick or box shaped items, believed to be the referenced purchased cocaine. Later that evening, surveillance recovered a trash bag which was discarded by **COX** in a nearby dumpster and it contained numerous bags/baggies coated with cocaine residue, cutting agents and paraphernalia, indicative of a large quantity of cocaine. A field text of a baggie from the seized baggies, tested positive for the presence of cocaine.

On Wednesday September 17, 2014, intercepted telephonic communications and electronic surveillance confirmed that **CLANTON** and **COX** were traveling to Philadelphia, Pennsylvania to meet with a cocaine source of supply. Surveillance was subsequently established at the known stash house, located at 601 Plaza Court, Aberdeen, MD. At approximately 1500 hours, members of surveillance observed **CLANTON** and **COX** arrive to 601 Plaza Court and both subjects exited a Kia Van owned by Shirley Belcher, a co-conspirator of the organization. Both **CLANTON** and **COX** entered the apartment building, with **COX** carrying a white bag. A period of time later, **COX** exited the apartment and drove from the location in a black Jaguar, a vehicle known to be operated by **ABRAMS**. A short time later, **COX** returned with Belcher, operating a Volkswagen passenger vehicle, and entered 601 Plaza Court. A period of time later, surveillance observes **CLANTON** leave the apartment on foot, but then return several minutes later. At the same time, **ABRAMS** and Belcher were observed exiting the apartment building. After a brief conversation with **CLANTON**, **ABRAMS** entered the

Volkswagen and departed the area. Belcher and **CLANTON** were then observed exiting the apartment and departing the location. Surveillance maintained visual contact on the apartment building and subsequently Detective Hunt observed a female exit the apartment and enter a black Nissan Maxima, carrying a trash bag. Detectives Hunt and Wolfe followed this vehicle/female to the Riverside Shopping Plaza, Belcamp, MD, where the female drove to the area of the Pizza Hut and threw the trash bag in a dumpster. Detective Wolfe immediately retrieved this trash bag and located within its contents, was a quantity of heroin. This heroin was confiscated and weighed, totaling approximately two (2) grams. A field text of the suspected heroin, tested positive for the presence of heroin.

On Saturday September 27, 2014, intercepted telephonic communications and electronic surveillance confirmed that **CLANTON** and **COX** were traveling to Philadelphia, Pennsylvania to meet with a cocaine source of supply. During this conversation, the source of supply told **CLANTON**, "it came to 63,410," further advising **CLANTON** that he owes him "190." Your affiant would aver that the source of supply had counted the currency provided to him by **CLANTON** for the purchase of CDS, and that currency totaled $63,410.00, short by $190.00. **CLANTON** told the source of supply that he will pay him the remaining $190.00. Your affiant knows that the current average cost of a kilogram of cocaine for the North East Region of the United States, is approximately $30-35,000.00 per kilogram. Based on this conversation, it is believed that

11

**CLANTON** paid for and purchased approximately two (2) kilograms of cocaine from this Philadelphia cocaine source of supply.

Electronic surveillance tracked **CLANTON** and **COX** back to Maryland, where investigators observed **CLANTON** and **COX**, arrive to the "stash house" located in Aberdeen, Maryland. At this location, surveillance observed **CLANTON** and **COX**, entered the apartment with COX carrying a white bag. Around this same time, surveillance observed **ABRAMS** arrive with a juvenile child. Both subject entered the apartment. During this time, surveillance observed **GREGORY** arrive and enter the apartment. After a short period of time, **GREGORY** was observed exiting the apartment and then departing from the location. A subsequent intercepted conversation was intercepted between **CLANTON** and **GREGORY**, where **GREGORY** told **CLANTON** to give a bottle of liquid that was in the freezer to a female subject.

After an extended period of time inside the residence, **COX** emerged from the apartment carrying a trash bag, which he disposed of in a nearby dumpster. This trash bag was immediately retrieved by detectives and found to contain CDS packaging and paraphernalia and baggies containing CDS residue, consistent with a large quantity of CDS. A field text of a baggie from the seized baggies, tested positive for the presence of cocaine. Both **ABRAMS** and the juvenile were then observed exiting the apartment, with **ABRAMS** carrying the same bag that **COX** was carrying when entering the apartment. **COX** was observed exiting the apartment and leaving the area operating a black Jaguar, known to be utilized by **ABRAMS**. Surveillance followed **ABRAMS** to the Stack and

Store Storage Facility, located at 805 S. Philadelphia Road, in Aberdeen, MD, where he entered the complex. Case Investigators know that **ABRAMS** utilizes unit L03 at this location. The storage unit is rented in the name of a female associate of **ABRAMS**.

On October 2, 2014, case investigators intercepted a telephonic communication between **GREGORY** and a Philadelphia cocaine source of supply (SOS). This SOS instructed **GREGORY** to have **CLANTON** call him. Shortly thereafter, **GREGORY** contacted **CLANTON** and relayed the message. Your affiant believes that **GREGORY** has an established relationship with the Philadelphia source of supply and confirms **GREGORY'S** status within the organization.

From the start of the electronic interception of communications on the telephone lines utilized by **ABRAMS, CLANTON** and **GREGORY**, it was determined that the organization's customers used coded or guarded language when referring to CDS. When customers would contact **ABRAMS, CLANTON** or **GREGORY** to purchase heroin, they would use the slang term "gas" and "dog food."

For example, on August 29, 2014, case investigators intercepted telephonic communications between **ABRAMS** and **CLANTON**, where **CLANTON** told **ABRAMS**, "give me your dog food." It was apparent from previous intercepted conversations on **CLANTON'S** phone lines, that he had customers requesting the purchase of heroin, but he himself had none readily available.

On September 7, 2014, **CLANTON** contacted a subject identified as Joe Mirenda. During this conversation, **CLANTON** told Mirenda that he has "4" for him, which is a

reference to a quantity of CDS. Mirenda acknowledged and asked **CLANTON** if he can obtain the CDS without payment up front. **CLANTON** confirmed that he would provide the CDS to Mirenda for payment at a later date. The conversation continued with the parties agreeing on a location to meet. At one point in the conversation, Mirenda told **CLANTON**, "I may have to ask for a couple dollars for gas but well c." Case Investigators have determined that "gas" in this organization is a reference to heroin and believe that Mirenda was asking **CLANTON** for a quantity of heroin when meeting to conduct the CDS transaction for "4."

On September 13, 2014, case investigators intercepted telephonic communications between **CLANTON** and **GREGORY**, where **GREGORY** asks **CLANTON** if he (**CLANTON**) "has any dog food left," to which **CLANTON** replied, "yes." **GREGORY** then advised **CLANTON** that he (**GREGORY**) was going to need it.

On Monday October 6, 2014, through intercepted communications, it was learned that **CLANTON** and **COX** were traveling to Pennsylvania to meet the source of supply for a CDS resupply. Based on previous and current conversations, it was determined that **CLANTON** and **COX** were meeting the same source of supply who they had met with during the above referenced September 27, 2014 Philadelphia CDS resupply trip. This was also the same source of supply who had contacted **GREGORY** and requested that he provide **CLANTON** with his phone number. During these conversations, **ABRAMS** told **CLANTON** that he was about to be to the house. Case Investigators know that the "house" is a reference to the stash house utilized by the organization. **CLANTON**

acknowledged. Approximately one hour later, **ABRAMS** notified **CLANTON** to tell him that he was at work. Case Investigators know that when **ABRAMS** refers to "work," he is referring to the automotive shop located at 1321 Loflin Road, in Aberdeen, MD, which is a location used by the organization to distribute CDS. **CLANTON** acknowledged and told **ABRAMS** that he will meet him there. It is believed that **CLANTON** and **ABRAMS** met to discuss the trip to Philadelphia and to make arrangements in person. **CLANTON** then contacted the Philadelphia source of supply and asked if he (**CLANTON**) can see him today. The source of supply replied, "yes." **CLANTON** then contacted **COX** and requested that **COX** meet him at the "house." Through additional intercepted conversations, case investigators learned that **CLANTON** was attempting to use a co-conspirators van for travel to Philadelphia. When **CLANTON** realized this vehicle was not available, a rental vehicle was obtained. This rental vehicle was leased to and in the name of Mardell **ABRAMS**.

A short time later, **CLANTON** contacted **COX** and the two meet for travel to Philadelphia. Case Investigators were able to "ping" **CLANTON'S** phone, which provided cell tower/GPS (Global Positioning System) locations of **CLANTON'S** phone. This information confirmed that **CLANTON** was in Philadelphia, Pennsylvania. DEA Agents in Philadelphia were able to locate **CLANTON'S** rental van. Once in Philadelphia, **CLANTON** met with what appeared to be two different sources of supply. It is believed that **CLANTON/COX** met with a heroin source of supply and a cocaine source of supply separately, before returning to Maryland. During these meetings, case

15

investigators believe that **CLANTON** provided the sources of supply with United States Currency in exchange for a large amount of cocaine and heroin.

After the CDS was obtained, electronic surveillance showed **CLANTON** traveling south-bound towards Maryland. Once the vehicle operated and occupied by **CLANTON** and **COX** arrived in Cecil County, MD, a traffic stop was initiated on the vehicle.

Prior to the apprehension of **ABRAMS, CLANTON and GREGORY**, search warrants were completed for vehicles and residences associated to **ABRAMS, COX, CLANTON and GREGORY**. The warrants were reviewed and signed by the Honorable Mimi Cooper, Judge of the District Court for Harford County. A search warrant was obtained for the above mentioned rental vehicle, a 2003 Chrysler Van, bearing Maryland registration, 5BR1804. The warrant was signed by the Honorable Mimi Cooper, Judge of the District Court for Harford County. A search of this vehicle pursuant to the stop revealed approximately 1,250 grams of cocaine and approximately 50 grams of suspected heroin. A field test of both substances resulted in a positive reaction for the presence of cocaine and heroin. Arrested in the vehicle were **CLANTON, COX** and a subject identified as Wesley Lewis.

A search of the storage unit utilized by **ABRAMS** resulted in the seizure of approximately $220,000.00 and one kilo press. The U.S. Currency was packaged in heat seals bags and labeled with numbers, which appeared to indicate the amount of currency contained in each pack. Those numbers were totaled to $220,000.00.

A search of **GREGORY'S** person, subsequent to his arrest on October 6, 2014,

resulted in the seizure of approximately one (1) ounce of cocaine.

Based on the foregoing, there is probable cause to believe that **ABRAMS, CLANTON, COX and GREGORY**, did conspire with others known and unknown to distribute and possess with the intent to distribute 500 grams or more of cocaine and a quantity of heroin, in violation of 21 U. S. C. § 846.

I, Paul Neikirk, affirm under penalties of perjury that the facts and circumstances recounted are true and accurate to the best of my knowledge, information and belief.

_____
Paul Neikirk
Special Agent
United States Drug Enforcement Administration

Signed to and sworn before me this ___7___ day of October 2014.

_____
Stephanie A. Gallagher
United States Magistrate Judge

17